## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | \* | |
| **BEACON ASSOCIATES, INC.,** | \* | |
| 900-A South Main Street, Suite 102 | \* | |
| Bel Air, Maryland 21014 | \* | Case No. _____ |
| | \* | |
| Plaintiff, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| **APPRIO, INC.,** | \* | |
| 425 3rd Street, S.W., Suite 600 | \* | |
| Washington, D.C. 20024 | \* | |
| | \* | |
| Defendant. | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

For its complaint, plaintiff Beacon Associates, Inc. ("Beacon"), through counsel, states as follows:

## NATURE OF THE ACTION

1.      This is a breach of contract action against Apprio, Inc. ("Apprio"), a prime federal contractor with the U.S. Department of Homeland Security, Federal Emergency Management Agency ("FEMA").

2.      Since 2014, Beacon has served as a subcontractor under Apprio's prime contract with FEMA, providing millions of dollars in services to support the training of more than 25,000 emergency personnel, first responders, and others each year at FEMA's Center for Domestic Preparedness at Fort McClellan in Anniston, Alabama.

3.      FEMA's training support services requirement is set-aside for small disadvantaged businesses under the U.S. Small Business Administration's ("SBA") 8(a) Business Development Program.

4.      Between 2009 and 2014, Beacon (then an 8(a) contractor) served as the prime contractor for these training support services, earning outstanding performance ratings by FEMA.

5.      Beacon's years of experience, workforce of trained and qualified employees, and hard-earned reputation supporting FEMA over five years afforded Beacon a substantial competitive advantage for the follow-on procurement.  However, when FEMA re-competed the requirement in late 2013 and early 2014, Beacon had graduated from the 8(a) program and was therefore no longer eligible to compete for the contract as a prime contractor.

6.      Consequently, Beacon identified Apprio, an 8(a) contractor, as a potential teaming partner whereby Beacon would materially assist Apprio in obtaining the contract in exchange for a share of 49% of the work as a subcontractor.

7.      The Apprio-Beacon prime-subcontractor team was successful, winning a 5-year contract with FEMA in 2014 to continue supporting the Center for Domestic Preparedness.

8.      Beacon's experience, employees, reputation and overall contributions were instrumental in securing the lucrative prime contract for Apprio.

9.      FEMA recently began the process of re-competing its training support services requirement for another 5-year cycle, with a final solicitation anticipated in several months and a new contract award expected by early 2019.

10.      Notwithstanding its role as a subcontractor, Beacon was a strategically valuable teaming partner for any prospective offeror due to the fact that Beacon had a nearly decade-long

track record of successful performance at the Center for Domestic Preparedness and employed 41 experienced personnel, including a 15-year veteran as Project Manager.

11.     Despite Beacon's successful performance as a subcontractor to Apprio, as well as Beacon's substantial contributions to Apprio's success, Apprio conceived a plan in or around January 2018 to sabotage Beacon's ability to team with another contractor and compete against Apprio for the next 5-year contract.

12.     In January 2018, shortly after FEMA formally announced the competition for the follow-on contract, Apprio first solicited Beacon's employees (without informing Beacon or obtaining Beacon's permission) to secure their commitment to work exclusively for Apprio in the follow-on contract.  Apprio even paid them $500 "retention bonuses" to secure such employment commitments, including a prohibition from sharing any information or knowledge regarding the operations or needs of the Center for Domestic Preparedness with anyone other than Apprio—including Beacon.

13.     Apprio's hostile actions violated the subcontract's non-solicitation clause and decimated Beacon's ability to compete effectively for the follow-on contract, having deprived Beacon of its experienced employees that would be critical to the success of any proposal to FEMA.

14.     After raiding Beacon's employees and securing their commitments, Apprio no longer had any use for Beacon.

15.     On February 27, 2018, despite more than one year remaining in Beacon's period of performance, Apprio abruptly and without any advance warning terminated the subcontract and promptly hired Beacon's 41 employees.

16.     The alleged basis for the immediate termination was Beacon's failure to pay two third-party vendor invoices totaling just $12,830.20 that Beacon was not responsible for paying and, in any event, had never even received until Apprio terminated the subcontract.

17.     Apprio never provided any warning or opportunity for Beacon to pay the two invoices, much less a 15-day cure period mandated by the subcontract.

18.     Apprio's hostile and calculated actions not only breached the subcontract, but were deliberately taken to eliminate Beacon as a viable competitor while strengthening Apprio's competitive position to win FEMA's new contract later this year.

19.     Without its trained and experienced employees, and no longer performing the incumbent work, Beacon cannot compete effectively for FEMA's follow-on procurement as a prime contractor and has now lost most of its value as a potential teaming partner for other prospective offerors.

20.     Additionally, Apprio's unjustified termination decision has gravely damaged Beacon's reputation as a federal contractor as well as its past performance record.

21.     Federal agencies are required to consider the past performance record of offerors including significant subcontractors.  It would be nearly impossible for a contractor with a termination for default on its record, especially one in connection with the incumbent contract, to obtain an acceptable confidence rating from the government and win a contract.

22.     Apprio's actions were deliberate, calculated, and unjustified.  Apprio has breached multiple provisions of the subcontract.

23.     Through this action, Beacon seeks judgment based on Apprio's multiple breaches of contract; an award of damages; and injunctive and declaratory relief rescinding the improper termination, immediately restoring Beacon's subcontract, and enjoining Apprio from employing

or attempting to employ Beacon's employees in violation of the subcontract, so that Beacon can compete for FEMA's new procurement on a fair and level playing field.

## PARTIES

24.     The plaintiff, Beacon, is a Maryland corporation with its principal address at 900-A South Main Street, Suite 102, Bel Air, Maryland 21014.

25.     The defendant, Apprio, is a Delaware corporation with its principal address at 425 3rd Street, S.W., Suite 600, Washington, D.C. 20024.

## JURISDICTION AND VENUE

26.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Beacon is a citizen of Maryland; Apprio is a citizen of the District of Columbia, and thus the parties are completely diverse; and the amount in controversy exceeds $75,000.

27.     Venue is proper under 28 U.S.C. § 1391 because defendant Apprio is subject to the Court's personal jurisdiction with respect to this action.

## STATEMENT OF FACTS

**A. Beacon's Performance of the Predecessor Contract and Contribution to Apprio's Success.**

28.     Between 2009 and 2014, Beacon was a prime contractor with FEMA providing various training support services to support FEMA's Center for Domestic Preparedness ("CDP") at Fort McClellan in Anniston, Alabama.

29.     Beacon's performance was successful and earned outstanding performance ratings from FEMA over the 5-year period of performance, averaging a 98 out of 100 score.

30.      Through its successful performance, Beacon recruited and trained more than three dozen qualified employees to support the CDP and, through its experienced workforce (including its Deputy Project Manager, Kristi Ledbetter, a 15-year veteran at the CDP), obtained

valuable knowledge, understanding and experience with the CDP and FEMA's operational needs.

31.     Through its successful performance, Beacon earned an excellent reputation with FEMA.

32.     In 2009, at the time of award, Beacon was a small disadvantaged business certified under the SBA's 8(a) Business Development Program.  FEMA's CDP Training Support Services requirement was set-aside for 8(a) contractors.

33.     However, in or around June 2012, Beacon graduated from the 8(a) program.

34.     Consequently, Beacon was not eligible to compete for the follow-on procurement in late 2013 and early 2014 as a prime contractor.

35.     Instead, Beacon identified and approached Apprio, an 8(a) program participant, to enter into a prime-subcontractor teaming arrangement, whereby Apprio would serve as the prime contractor and perform 51% of the services and Beacon would serve as the subcontractor and perform 49% of the services.

36.     Beacon's excellent reputation, dozens of qualified and experienced employees (including Key Personnel), past performance record, and extensive knowledge and understanding of CDP operations provided Beacon a substantial competitive advantage for the follow-on competition.

**B.  FEMA's Prime Contract Award for CDP Training Support Services to Apprio.**

37.     On March 14, 2014, FEMA awarded Prime Contract No. HSFE20-14-R-0050 to Apprio to provide various training support services, including administrative registration support, travel arrangements (air and ground), scheduling of transportation, classroom setup and training

support materials, outreach program, archival of historical records, and planning for support

activities ("CDP Training Support Services").

38.     The prime contract was a continuation of the 5-year contract that Beacon had just

completed as a prime contractor.

39.     Beacon's contributions to the Apprio-Beacon team were instrumental in Apprio's

submission of a competitive and ultimately successful proposal to FEMA.

40.     Without Beacon as a major teaming partner or Beacon's contributions, Apprio

would not have won the FEMA contract.

41.     The prime contract's period of performance consisted of a phase-in period and

base year (March 15, 2014 through March 14, 2015), plus four one-year options through March

14, 2019 (Section F.2).

42.     Clause I.4, 52.217-8, Option to Extend Services (NOV 1999), and Clause I.5,

52.217-9, Option to Extend the Term of the Contract (MAR 2000), provided FEMA authority to

exercise the options and extend the term of the prime contract.

43.     The prime contract contained contract line items ("CLINs") for Apprio's direct

labor on a fixed-price basis, as well as funding for Other Direct Costs ("ODCs") that may arise,

such as conference expenses, bus transportation, overtime and incidental supplies and equipment.

44.     The prime contract initially provided for a total of $650,000.00 in ODCs for each

contract year, reflected in CLINs 0002, 1002, 2002, 3002, and 4002.

45.     The prime contract provided that FEMA would reimburse Apprio for ODCs on a

cost reimbursement basis, with an allowable 1% General and Administrative ("G&A") rate on all

ODCs (Section B.3).

**C.  Apprio's Subcontract Award for CDP Training Support Services to Beacon.**

46.     Consistent with the teaming agreement between Apprio and Beacon, the parties negotiated a subcontract after the prime contract award, providing for a 51-49% workshare split between Apprio and Beacon.

47.     On March 30, 2014, Apprio as prime contractor and Beacon as subcontractor executed Subcontract No. 14APP0001 (attached as Exhibit 1 hereto).

48.     The subcontract contained general terms and conditions in Appendix A and identified the specific work that Beacon would perform in Appendix B.

49.     Subcontract Sections 3.1 and 5.1 stated that "Subcontractor shall provide to Contractor the services set forth in Appendix B," and "[i]n consideration of Services performed, Contractor will pay Subcontractor the fees set forth in Appendix B."

50.     The subcontract's initial period of performance was March 15, 2014 through March 14, 2015.

51.     However, Section 4.2 of the subcontract stated:

> Contractor shall exercise any extensions to the term hereof, promptly following the exercise of any Prime Contract extension made by the Government under the Prime Contract. Options to extend this Agreement shall be made by written modification agreed to by all parties.

52.     Over the course of the prime contract, FEMA exercised all four options in accordance with Clause I.5, 52.217-9, Option to Extend the Term of the Contract (MAR 2000).

53.     Consistent with Section 4.2 of the subcontract, for the first three option periods, Apprio extended Beacon's subcontract for another year when FEMA extended the term of the prime contract.

54.     On February 27, 2018, FEMA exercised the final extension, Option Year 4, extending the prime contract through March 14, 2019.

55.     However, instead of extending Beacon's subcontract for another year, as it had done before, Apprio issued Beacon a notice of termination (*see* discussion below).

56.     In the subcontract, Beacon and Apprio agreed that Beacon, as subcontractor, would perform the work outlined in Apprio's prime contract with FEMA.  *See* Section 9.1 ("Subcontractor shall perform the Services in accordance with the applicable Prime Contract"); Appendix B, Section 1.1 ("Subcontractor will perform tasks as outlined in the Prime Contract").

57.     Section 5.2 stated that "Subcontractor is not authorized to perform Services, make expenditures or incur obligations which exceed the costs as set forth in Appendix B, plus travel and other direct costs that are pre-approved by Apprio and funded through a separate modification; and such amount, unless otherwise specified herein or through a formal change order, is the maximum amount for which Contractor shall be liable."

58.     Appendix B to the subcontract contained the agreed-upon workshare and fixed price for Beacon to furnish multiple personnel across several labor categories, such as project management, student services, outreach programs and training support.

59.     Section 5 of Appendix A contained a non-solicitation clause, stating:

> During the term of this agreement and thereafter for a period of one (1) year, both the Subcontractor and Contractor shall not directly, for its own account or for the account of any other individual, corporation, partnership, association or firm, induce or attempt to induce any employee of the other party to leave his or her employment with the applicable party. This does not include individuals responding to media advertised employment opportunities or any individual who makes an unsolicited direct contact with a Party regarding employment.

60.     Section 13 of Appendix A contained a termination for default clause, stating in part:

> For fixed price agreements or Task orders, Contractor may terminate Subcontractor's performance in whole or in part in the event that Subcontractor fails to strictly adhere to the terms and conditions of this

Agreement; fails to maintain progress of the work so as to jeopardize the successful and timely completion of the schedule Services in accordance with the SOW (Appendix B) and fails fifteen business days (15) calendar days [sic] after Contractor notification to the Subcontract to take appropriate corrective action, Subcontractor shall cease such Services immediately upon Contractor's demand …

Either party can terminate this agreement in the event of a material breach of the terms of this agreement by the other party and/or in the event of any proceeding by or against the other party in bankruptcy or insolvency or appointment of a receiver or trustee or assignment for the benefit of creditors.

61.    Section 16 of Appendix A contained a limitation of liability clause, stating in relevant part:

NOTWITHSTANDING ANY OTHER PROVISION TO THE CONTRARY HEREIN (WITH THE EXCEPTION OF THE PRIME CONTRACTOR'S OBLIGATION TO AWARD WORK AND TO PAY SUBCONTRACTOR IN ACCORDANCE WITH THIS SUBCONTRACT), IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR SPECIAL, CONSEQUENTIAL, INDIRECT, OR PUNITIVE DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, LOSS OF USE OR EQUIPMENT DOWN TIME, AND LOSS OF OR CORRUPTION TO DATA) ARISING OUT OF OR RELATING TO THIS AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH DAMAGES ARE SOUGHT, AND EVEN IF THE PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSS.

62.    Thus, the limitation of liability clause, which generally precluded certain consequential and indirect damages, specifically exempted from this limitation the "prime contractor's obligation to award work and to pay subcontractor in accordance with this subcontract."

63.    Section 2.1 of Appendix B stated that "Subcontractor shall be paid the FFP prices(s) [sic] specified below in accordance with Section 5.1 of this Agreement …."

64.     Section 2.1 of Appendix B stated:

> Subcontractor shall satisfy ODC requirements as identified by Work Orders which are authorized by the customer … All costs associated with Other Direct Cost (ODC's) will be managed by Beacon Associates and will not be considered part of the agreed work-share for Beacon of 49% of personnel costs incurred under this contract.

65.     Consistent with Section B.3 of the prime contract, Section 2 of Appendix B of the subcontract stated further that all subcontract work would be performed on a firm fixed-price basis, and that "other direct costs ("ODCs") shall be funded through purchase orders, pursuant to Section 5.2 of this Agreement. ODC's will be invoiced at cost plus 1% G&A."

66.     Thus, the subcontract provided that ODCs funded by purchase orders pursuant to Section 5.2 of the subcontract would be passed through to FEMA from Beacon, since Section B.3 of the prime contract allowed Apprio to invoice only the cost plus a 1% G&A rate.

67.     Section 24 of Appendix A provided:

> In the event of a conflict in the terms and conditions of the contract documents, the following order of precedence shall apply:
> A.  The Subcontract Agreement
> B.  The Statement of Work and Budget (Appendix B)
> C.  The General Terms and Conditions (Appendix A)
> D.  FAR Clauses (Appendix C)

**D.  Apprio's Mismanagement of the Subcontract, Concealment of Surge ODC Funding, and Failure to Notify Beacon and Modify Beacon's Subcontract.**

68.     Over the course of the subcontract, Apprio failed to manage the subcontract relationship adequately.

69.     For example, Apprio routinely failed to provide a modification to the subcontract or purchase orders to authorize Beacon to incur ODC costs.

70.     On several occasions, Beacon had to email Apprio and request permission to incur ODC expenses in the absence of a modification providing ODC funding.

71.     On March 30, 2017, Apprio and Beacon executed Modification No. 9 to the subcontract.  Modification No. 9 exercised Option Year 3, extending the subcontract's period of performance from March 15, 2017 through March 14, 2018.

72.     Appendix B to Modification No. 9 provided for a total of $1,818,073.78 for firm fixed-price labor during Option Year 3, but as with prior subcontract modifications, it did not provide funding for ODCs.

73.     Specifically, Modification No. 9 stated that "Travel and ODCs are not included in the above amounts and will be reimbursed at cost plus 1% additional for General & Administrative costs."

74.     Over the course of the subcontract, Beacon regularly received invoices directly from various ODC vendors engaged by Apprio.

75.     Without ever executing any signed modification or waiver of Beacon's right not to incur ODC obligations unless funded by Apprio (subcontract Sections 5.2, 10.1), Beacon nevertheless paid the ODC invoices it received up until September 2017, when certain ODC invoices suddenly increased substantially.

76.     Up until that time, the average monthly ODC cost incurred by Beacon was approximately $30,000 to $35,000, well within the $650,000 annual ODC ceiling reflected in the prime contract.

77.     However, in August and September 2017, significant hurricane activity (including emergencies caused by Hurricanes Harvey, Maria and Irma) prompted an unexpected surge in FEMA training requirements for emergency personnel and other first responders.

78.     This surge in training requirements significantly increased the volume of ODCs on the prime contract, such as overtime labor and transportation costs.

79.    On September 19, 2017, FEMA issued Modification No. P00032 to the prime contract, adding $231,257.50 in funding for ODCs under CLIN 3002.  The purpose of this additional funding was for external group training.

80.    On September 21, 2017, FEMA issued Modification No. P00033 to the prime contract, adding $1,780,000.00 in funding for ODCs under CLIN 3002.  The purpose of this additional funding was for surge related training.

81.    Apprio did not notify Beacon that it had received two modifications from FEMA increasing the total ODC funding by approximately $2 million, nor did Apprio issue a modification to the subcontract to provide Beacon with the increased ODC funding, all of which Apprio was obligated to provide to Beacon.

82.    One type of ODC that began to surge was bus transportation services.

83.    Apprio had engaged Cline Tours, a charter bus company, to provide such services.

84.    Apprio directed Cline Tours to send their invoices directly to Beacon for payment, some of which were for hundreds of thousands of dollars, well in excess of previous ODC charges.

85.    Beacon was reluctant to pay such large ODC invoices in the absence of a subcontract modification from Apprio authorizing such large expenditures, since Section 5.2 of the subcontract stated that "Subcontractor is not authorized to ... make expenditures or incur obligations which exceed the costs as set forth in Appendix B, plus travel and other direct costs that are pre-approved by Apprio and funded through a separate modification."

86.     In early October 2017, Beacon's Director of Technology and Operations, Tony Fares, emailed Apprio's Controller, Marvin Huber, regarding the status of Apprio's payment of Beacon's outstanding August invoice, which at that time was past due.

87.     Fares also asked Huber if Apprio would pay Cline Tour bus invoices directly, and Huber agreed, stating, "I don't see that to be a problem Tony."

88.     On or around October 16, 2017, Huber again told Fares during a telephone conversation that Apprio would cover payment on various Cline Tour bus invoices.

89.     However, on November 2, 2017, Huber requested that Beacon pay the remaining Cline Tour invoices.

90.     On November 7, 2017, Apprio's President, Darryl Britt, emailed Beacon's President, Carol Koffinke, regarding payment of certain Cline Tour invoices.

91.     Britt stated that Apprio was in the process of "finalizing an acquisition" and that Apprio's direct payment of ODC invoices would affect its cash flow model.

92.     In response, Koffinke informed Britt that Apprio failed to notify Beacon of the nearly $2 million in addition ODC funding that Apprio had apparently received from FEMA and failed to modify the subcontract accordingly.

93.     Koffinke informed Britt that Beacon had "no contractual obligation to pay for the ODC's on this mod," suggested that Apprio work with Cline Tours regarding payment, and offered Beacon's assistance should Apprio desire it.

94.     Finally, Koffinke reminded Britt that Beacon's "contract for this Option Year had zero dollars funded for ODC's."

95.     In total, Beacon received dozens upon dozens of invoices from this one particular bus company alone, and Beacon is not aware of any that remain outstanding and unpaid.

**E.  FEMA's Announcement of the Follow-On Competition for CDP Training Support Services.**

96.    On January 16, 2018, FEMA issued a "sources sought" notice and Request for Information ("RFI") on www.fedbizopps.gov (the federal government portal for publicizing contract actions), along with a draft Performance Work Statement for the follow-on procurement for CDP Training Support Services.

97.    FEMA's notice requested input from prospective offerors on the draft Performance Work Statement and related terms of the new procurement.

98.    The notice indicated that FEMA would provide prospective offerors 45 days to prepare proposals once it issued the final solicitation, and required all responses to the draft Performance Work Statement be submitted by February 9, 2018.

99.    FEMA did not state when it would release the final solicitation, but it was anticipated no later than late spring or early summer 2018.

100.    Due to the short turn-around period for proposal submission after FEMA's release of the final solicitation (45 days), prospective offerors are already beginning to identify potential teaming partners and develop their business capture strategies.

**F.  Apprio's Scheme to Solicit Beacon's Employees and Terminate Beacon's Subcontract.**

101.    In or around late January 2018, shortly after FEMA's announcement, Apprio approached Beacon's 41 employees working under the subcontract and solicited them for potential employment with Apprio.

102.    To secure their commitment, Apprio offered Beacon's employees a $500 "retention bonus" if they agreed to accept employment with Apprio.

103.    On January 29, 2018, Apprio issued formal letters to Beacon's employees, stating that Apprio was "pleased to provide you a contingent offer for the position" at which each employee was currently employed by Beacon.

104.    The letter advised Beacon's employees that Apprio would use the employees' names and resumes in Apprio's proposal to be submitted to FEMA for the new CDP Training Support Services contract, and confirmed that Beacon's employees were under "an exclusive agreement with Apprio to work on this engagement."

105.    The letter further prohibited Beacon's employees from sharing any "information about operations, systems, and procedures currently in place with the CDP Training Support Services contract" outside of Apprio.

106.    On January 30, 2018, Britt emailed Koffinke and disclosed that Apprio has been "planning for the recompete of CDP and now that the RFI is on the street, we've started to talk to the staff to head off questions."

107.    In the same email, Britt readily admitted that he had already offered retention bonuses to the "entire contract team" and that some of Beacon's employees had "already signed the paperwork I provided to them."

108.    Britt stated further that he had "heard through the grapevine that Beacon was not pursuing the contract, hence I figured it was of little consequence."

109.    Apprio thus knowingly breached the subcontract's non-solicitation clause because it concluded that it would be "of little consequence."

110.    On January 31, 2018, Beacon responded, warning Apprio that "[h]earing something through the grapevine and allowing that information, without confirmation, to prompt you to solicit my employees, is completely unacceptable and in violation of our agreement."

111.    Apprio did not provide any response or take any corrective action.

112.    On February 27, 2018, FEMA exercised the fourth and final option in the prime contract, extending Apprio's contract until March 14, 2019.

113.    On that same day, instead of extending Beacon's subcontract as required by Section 4.2 of the subcontract, Apprio issued a letter (attached as Exhibit 2 hereto) informing Beacon that Apprio was terminating the subcontract under Section 13 of Appendix A to the subcontract and directing Beacon to stop work by the end of the day.

114.    Apprio stated that FEMA apparently informed Apprio on February 23, 2018, that two ODC invoices issued by American Coach Lines of Atlanta had not been paid (Invoice No. 76367 dated September 9, 2017 for $8,422.20; and Invoice No. 76386 dated September 10, 2017 for $4,408.00).

115.    Apprio stated that Beacon was obligated to pay the two American Coach invoices and characterized Beacon's failure to pay them as "material breaches of its obligations under the Subcontract."

116.    Apprio did not assert in any way that Beacon "fail[ed] to maintain the progress of the work so as to jeopardize the successful and timely completion of the schedule Services," as required by Section 13 of Appendix B before a "termination for default" can be exercised.

117.    Notwithstanding the extended prime contract with FEMA, Apprio further stated that it had no intention of extending the subcontract beyond March 14, 2018, and that it was time to end the subcontract "given recent events."

118.    In addition, Apprio described "material concerns" it had regarding Beacon's business, which Apprio characterized as "significantly unstable."

119.    Apprio's letter added that it learned from several Beacon employees that Beacon does not plan to pursue the "expected follow-on contract to the Prime Contract," and concluded that Beacon's alleged "lack of future intent with respect to the follow-on" contract meant that it was in the best interest of all parties "that an immediate change take place."

120.    Prior to receiving Apprio's notice of termination containing the two American Coach invoices attached as an exhibit, Beacon had never received such invoices.  In fact, Beacon did not even engage the services of American Coach and was unaware that that company had provided any transportation in connection with the prime contract in 2017.

121.    Prior to receiving Apprio's notice of termination, Beacon had not received any notification from Apprio regarding an alleged default or breach of the subcontract for any reason, including not paying the two subject American Coach ODC invoices.

122.    Prior to terminating the subcontract, Apprio did not provide Beacon a period of 15 days to cure the alleged default and pay the two American Coach invoices, which amounted to only $12,830.20 (out of an average of more than $400,000 in ODC costs each year).

123.    Apprio's termination notice included a letter purportedly to Beacon from Apprio's counsel dated November 24, 2017.  Apprio never provided or transmitted this letter to Beacon and Beacon never received this letter until February 27, 2018.

124.    Even if Beacon had received that letter earlier, it only discussed "ODC obligations" generally and did not reference any specific invoices, much less the two subject American Coach invoices on which Apprio based its termination of the subcontract.

125.    Although the letter accused Beacon of being in default under the subcontract, the letter did not specify any amount that Beacon should pay to cure the alleged default, or any other form of remedial corrective action that Beacon should take.  Rather, Apprio stated that it

"expects that Beacon will satisfy all of its *future* ODC obligations under the Subcontract" (emphasis added).

126.    The November 24, 2017 letter was also not addressed to the Beacon employee to whom valid notice must be given, pursuant to Section 8.3 of the subcontract.

127.    Apprio never modified the subcontract to authorize Beacon to incur additional ODC costs despite FEMA's modification of the prime contract in September 2017 to add approximately $2 million in ODC funding.

128.    Apprio's failure to modify the subcontract and concealment of the additional $2 million in ODC funding from Beacon deprived Beacon of 1% G&A fee on the anticipated ODCs that it would have received had Apprio complied with its obligations under the subcontract.

129.    Apprio never directed Beacon, through purchase orders or otherwise, to incur costs by paying the two American Coach invoices and never provided the two American Coach invoices to Beacon for payment.

130.    At all times, from the beginning of the subcontract through the date of termination, Beacon performed exceptionally well, performed all of the services identified in Appendix B to the subcontract, and satisfied all requirements of the subcontract.

**G.  Beacon's Inability to Compete for the Follow-on CDP Training Support Services Contract and Other Contracts Going Forward.**

131.    Immediately after terminating Beacon's subcontract, Apprio again solicited Beacon's employees and hired them to begin employment with Apprio on February 28, 2018—14 days before the completion of subcontract Option Year 3 and the work and payment thereunder.

132.    The annual value of the fixed-price labor portion of Beacon's subcontract during Option Year 3 ending March 14, 2018 was $1,818,073.78, and the value during Option Year 4 ending March 14, 2019 was $1,955,451.04.

133.    Without the aid of this Court, Apprio's unlawful conduct has taken away from Beacon approximately 16% of its total business for the period of February 28, 2017 through March 14, 2019.

134.    Moreover, without this Court's aid, Apprio's unlawful conduct imposes on Beacon various significant unquantifiable and irreparable losses going forward in the form of lost or impaired business opportunities that Beacon was otherwise positioned to have.

135.    These lost or impaired opportunities include without limitation the inability to meaningfully compete for the follow-on FEMA CDP Training Support Services contract anticipated no later than late spring or early summer 2018, for numerous other FEMA contracts that Beacon has been planning to bid on, for future FEMA contracts over the long-run, and for other government contracts in the near- and long-term.

136.    With respect to the FEMA follow-on contract, Beacon will have zero incumbent employees to bid.

137.    Successfully bidding with non-incumbent employees will be virtually impossible, given that: (a)  Beacon cannot speak to any of its former employees as a result of the non-compete and non-disclosure agreements that Apprio enticed them to sign with $500 "retention bonuses" while still employed by Beacon and therefore cannot use their knowledge, understanding and experience of CDP operations in Beacon's proposal; (b) Beacon cannot obtain letters of commitment from ex-Beacon employees who are precluded from supporting any contractor other than Apprio; (c) proposing to perform with dozens of new staff and no

experienced personnel creates risk and would represent a weakness in any proposal to FEMA; and (d) new employees are unattractive to FEMA because the CDP security process for new employees can take up to a year and is expensive for FEMA.

138.    Apprio has also taken Beacon's key personnel, such as Kristi Ledbetter who had been supporting the CDP for 15 years and was the Deputy Project Manager.

139.    Employees who specialize in government contracting work are not fungible; they are very difficult and often impossible to replace in a timely manner due to geographical and security process limitations alone.

140.    Further, Apprio has taken from Beacon the personnel who would be necessary to train new employees.

141.    All of these limitations preclude Beacon from being an attractive teaming partner.

142.    More generally, Apprio's termination of Beacon based on purported "material breaches" of contract also does significant irreparable damage to Beacon's hard-earned reputation with FEMA, other government entities, and potential teaming partners.

143.    "Past performance" is a critical criterion in the federal government's selection of contractors, and Apprio has deprived Beacon of the strong past performance record Beacon had worked hard to build over many years.

144.    Beacon's past performance under the subcontract is broadly applicable and relevant to all the kinds of work that Beacon would bid on, not just the CDP follow-on contract.

145.    Additionally, Beacon has been compelled to divert resources to address the disruption and damages caused by Apprio's abrupt and unjustified termination, which has distracted Beacon and diverted resources from Beacon's efforts to focus on growth for the company.

## COUNT I
## (BREACH OF CONTRACT—TERMINATION)

146.     Beacon repeats and incorporates herein the allegations contained in all other paragraphs of this Complaint.

147.     Apprio's termination of the subcontract without justification constitutes a breach of contract.

148.     Beacon did not default and did not materially breach the subcontract.

149.     Beacon was not obligated to pay the two American Coach invoices because: (a) it did not order services from American Coach, was not in privity with FEMA, and never received American Coach's invoices until Apprio terminated the subcontract; and (b) Apprio never provided funding or authorization for Beacon to incur costs associated with the American Coach invoices, or any other contractual direction as required by Section 5.2 of the subcontract and Section 2.2 of Appendix B to the subcontract.

150.     Even if Beacon was obligated to pay the two American Coach invoices (which it was not), Beacon did not receive the invoices until February 27, 2018 when Apprio terminated the subcontract on the basis of Beacon's non-payment.  Therefore, Beacon could not have paid the invoices prior to termination, even if it was obligated to do so.

151.     Apprio failed to provide a period of 15 days for Beacon to cure any alleged default as required by Section 13 of Appendix A to the subcontract.  Apprio never informed Beacon that it believed Beacon's failure to pay the two American Coach invoices constituted a default of its obligations under the subcontract, or informed Beacon that Apprio would terminate the subcontract if Beacon did not pay the invoices within 15 days.

152.     Apprio's baseless perception of Beacon's business as "unstable" and Beacon's alleged future plans with respect to FEMA's new CDP Training Support Services contract does

not justify Apprio's termination of the subcontract.  Such considerations are irrelevant to Beacon's obligations under the subcontract.

153.    Under the subcontract, Apprio was obligated to extend the subcontract through March 14, 2019, since FEMA extended the prime contract through March 14, 2019.  *See* Section 4.2 ("Contractor shall exercise any extensions to the term hereof, promptly following the exercise of any Prime Contract extension made by the Government under the Prime Contract.").  Apprio's failure to extend Beacon's contract constitutes a breach of contract (or anticipatory breach of contract).

154.    Under Section 2.2 of Appendix B to the subcontract, Apprio was obligated to assign all ODCs to Beacon, entitling Beacon to a 1% G&A fee.  Apprio failed to notify Beacon that FEMA had added approximately $2 million in ODC funding to the prime contract during Option Year 3 and retained most of the ODC funding for itself.  Apprio's failure to assign all ODC funding to Beacon constitutes a breach of contract.

155.    Apprio's breach of the subcontract and improper termination has damaged Beacon in an amount to be determined at trial, including the loss of revenue, fees and profit from the work Apprio was obligated to award to Beacon, and caused Beacon unquantifiable and irreparable harms in the form of present and future lost or impaired business opportunities as described herein.

### COUNT II
### (BREACH OF CONTRACT—NON-SOLICITATION)

156.    Beacon repeats and incorporates herein the allegations contained in all other paragraphs of this Complaint.

157.    Section 16 of Appendix A to the subcontract prohibited Apprio from directly or indirectly soliciting Beacon's employees during the term of the subcontract and for a period of one year thereafter.

158.    Notwithstanding this unambiguous provision, Apprio deliberately approached Beacon's employees during the term of the subcontract and solicited them for employment with Apprio.

159.    Apprio even sought and in most cases obtained written commitments from Beacon's employees to work exclusively for Apprio with respect to FEMA's follow-on procurement.

160.    To secure the employment commitment of Beacon's employees, Apprio offered them $500 retention bonuses.

161.    Apprio has already admitted to Beacon that it took such action and that it did so because it believed that Beacon was not interested in pursuing the FEMA follow-on procurement and that hiring Beacon's employees in violation of the subcontract would be "of no consequence."

162.    Apprio's actions, including its offer and payment of retention bonuses, constitute a deliberate and clear breach of the subcontract's non-solicitation clause.

163.    Immediately after Apprio terminated the subcontract, Apprio solicited Beacon's employees again, offering them employment to begin the next morning on February 28, 2018.

164.    Apprio's actions again constituted a direct solicitation of Beacon's employees in violation of the subcontract's non-solicitation clause.

165.     Apprio's breach of the non-solicitation clause was an essential first step to position Apprio to eliminate Beacon based on the pretext of not paying the two American Coach invoices.

166.     Had Apprio honored its obligations under the non-solicitation clause, it would not have had any employees to perform the positions filled by Beacon and would not have been able to terminate Beacon's subcontract.

167.     Apprio's breach of the subcontract and violation of the non-solicitation has damaged Beacon in an amount to be determined at trial, including the loss of revenue and profit from the work Apprio was obligated to award to Beacon, and caused Beacon unquantifiable and irreparable harms in the form of present and future lost or impaired business opportunities as described herein.

## COUNT III
## (DECLARATORY RELIEF)

168.     Beacon repeats and incorporates herein the allegations contained in all other paragraphs of this Complaint.

169.     An actual controversy exists as to whether Apprio permissibly terminated the subcontract or whether it ought to remain in effect.

170.     As a party to the subcontract, Beacon is an interested party in this actual controversy seeking a declaration of its rights and other legal relations.

171.     Accordingly, Beacon seeks a judgment from this Court declaring:

   a.   That Beacon was not obligated to pay the two American Coach invoices, which Apprio did not fund, authorize through subcontract modification, or otherwise issue to Beacon through purchase orders;

   b.   That Beacon did not breach the subcontract;

c.  That any default by Beacon was not material and did not justify Apprio's termination of the subcontract;

d.  That the subcontract is reinstated and restored to the status quo ante before Apprio's improper termination, and is extended through March 14, 2019;

e.  That Apprio breached the subcontract by improperly terminating it;

f.  That Apprio breached the subcontract's non-solicitation clause; and

g.  That Apprio breached the subcontract by failing to modify the subcontract to assign all ODCs to Beacon in response to FEMA's September 19 and 21, 2017 modifications to the prime contract substantially increasing total ODC funding.

## PRAYER FOR RELIEF

WHEREFORE, Beacon demands judgment in its favor against Apprio:

A.  Granting it injunctive and declaratory relief;

B.  Granting it compensatory damages, including lost profit on the work that Apprio was obligated to award to Beacon through March 14, 2019;

C.  Awarding it attorneys' fees, reasonable costs, and disbursements;

D.  Awarding it pre- and post-judgment interest; and

E.  Granting such other and further relief as the Court deems just and proper.

Dated: March 14, 2018       Respectfully submitted,

/s/ Joseph L. Robbins
James Y. Boland (D.C. Bar No. 499355)*
VENABLE LLP
8010 Towers Crescent Drive, Suite 300
Tysons, Virginia 22182
(703) 760-1997
jyboland@venable.com
*Pro hac vice application forthcoming

Joseph L. Robbins (D.C. Bar No. 1016300)

-26-

VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, D.C. 20001
(202) 344-4000
jlrobbins@venable.com

*Counsel for Plaintiff Beacon Associates, Inc.*